## WASCO FLASHING CO. v. ROSS.
### Civ. A. No. 50-146.

United States District Court
D. Massachusetts.

Jan. 8, 1951.

Ezekiel Wolf, Boston, Mass., for plaintiff.

Herbert A. Baker, Boston, Mass., for defendant.

FORD, District Judge.

Wasco Flashing Company in this action alleges infringement by defendant of United States Patent. No. 2,005,221, for a multiply flashing structure, originally issued on June 18, 1935 to Samuel H. Cohen and Jacob Wasserman. Plaintiff is the present owner by virtue of an assignment from the original patentees. Defendant denies infringement, and also denies the validity of the patent.

Claim 1 of the patent in suit reads as follows: "1. A multi-ply flashing structure adapted to be embedded in a mortar seam and comprising three plies, the inner one being substantially impermeable, non-corrodible sheet metal and the outer ones being waterproofed fibrous sheet material bonded facially to the surfaces of said inner ply and presenting in their fibrous texture a multiplicity of exposed recesses into which the mortar of a seam may enter in substantial amount and harden to lock said structure in such seam." The other claims involved here, Claims 2, 3, and 4, are substantially the same as Claim 1. Claims 5 and 6, which involve the use of a felted material for the outer layers, are not in issue here.

Flashing is a material used in walls of brick or masonry construction. Under adverse weather conditions walls made of such materials, which are not themselves impervious to rain and moisture, can become saturated, and moisture eventually would flow to the interior of the building. Flashing essentially is a relatively thin sheet of waterproof material which is imbedded in the concrete of the wall at strategic points, such as foundations, under cornices and copings, or around openings in the wall, such as for windows, for the purpose of cutting off rain or other moisture and diverting its flow to the outside of the wall.

The flashing material described in plaintiff's patent is a three-ply structure. It consists of an inner layer of some substance such as a thin sheet of copper which performs the essential function of cutting off the flow of water. The outer layers, one on each side of this copper strip, are made of woven fabric which has been waterproofed, i.e., the fibers themselves have been covered with a water-repellent material so as to protect them from the effects of weather, without, however, closing up the interstices between the fibers. This fabric is bonded to the surfaces of the inner ply with mastic or some other adhesive agent, which is used in such amount that the excess does not fill in these interstices, but leaves them open on the outer side of the fabric so that in the completed material they appear as recesses or openings on both outer surfaces of the flashing. This, says plaintiff, is the distinctive feature of the flashing. These recesses are filled with the wet mortar into which the flashing is imbedded, and when the mortar has hardened, the flashing and mortar are interlocked in such a way as to prevent the mortar from slipping along the surface of the flashing.

### Infringement

On the question of infringement, defendant admits that the flashing which he

manufactures is in all material respects substantially the same as the flashing made by plaintiff. But the question of infringement must be decided by comparing defendant's product not with what plaintiff actually makes but with the product described in the claims of plaintiff's patent. Defendant denies that either of these flashings conforms to the claims of the patent. Both use a thin sheet of copper for the inner ply, and for the outer ply both use a woven fabric of four-ounce cotton duck which they purchase already waterproofed and which has been available on the market at least since 1927. Witnesses disagreed as to whether this was properly described as a closely woven or a coarsely woven material. From the sample placed in evidence (plaintiff's exhibit 4) it appears to be a mesh-like fabric having about thirty threads or fibers to each inch both lengthwise and crosswise. In the form in which it is used many of the interstices have been filled with the waterproofing material, but a great many are still open. Of the various samples of the completed product of both plaintiff and defendant which were placed in evidence, plaintiff's exhibit 2 will be particularly considered. This is a commercial sample of the type distributed by defendant to prospective customers, and plaintiff relies upon it as being truly typical of defendant's actual product, and as showing more clearly than other samples that that product infringes the patent. In this sample it is difficult to detect with the naked eye many openings on the outer surface, but such openings are somewhat more evident in a section of the outer fabric layer stripped away from the inner ply and held up to the light. There are numerous openings large enough so that light can be seen through them. But the mastic or asphalt bonding from which this outer fabric is pulled away is clearly marked with a pattern of elevations and depressions where the reticulated fabric has been embedded in the bonding layer. Thus before the layers were pulled apart, the openings in the fabric were filled in part by the bonding material. Moreover, the product of defendant in its finished state has been dusted with a coating of mica, which is intended to prevent sticking but which in fact covers many of the openings from the outside.

The claims of the patent, however, require that the openings be of such a nature as to allow mortar to enter in *substantial* amount. Inspection of the sample of flashing here in evidence makes it perfectly clear that only minute quantities of mortar could ever enter the tiny holes which still remain open on the surface of the material. The only evidence as to whether any mortar did in fact enter the openings was the statement of Wasserman, a witness for plaintiff, that he had observed some of plaintiff's flashing which had been removed from a wall in which it had been placed, and had seen some mortar in the openings of the outer ply, in an amount so small, however, that it could easily be removed with a brush. Evidence further showed that three-fourths of the material in mortar is sand which is too coarse to penetrate the tiny openings on the outer surface of the flashing, and that at most only fine particles of the cement and lime in the mortar mixture could be carried into these open spaces. The amount is certainly not substantial in the every-day sense of that word. It is true, of course, that in some cases a very small quantity may be substantial in relation to the amount needed to attain a given purpose. But there has been no evidence here to indicate the amount of mortar needed to produce interlocking or that it is so small that the amount which could enter the recesses left open on these flashings is substantial in relation thereto.

Plaintiff's contention is that substantial here means "large in proportion to the size of the openings themselves." This must be rejected, for the adoption of such a definition would render the patent claims meaningless. The patent tells us that the openings must be such as to admit substantial amounts of mortar. It gets us nowhere to define a substantial amount of mortar as enough mortar to fill the openings. Plaintiff has failed to show that the openings on the surface of defendant's product are such as to admit substantial amounts of mortar. Hence, it must be found that de-

fendant's product does not infringe Claims 1 to 4 of plaintiff's patent.

## Validity

Defendant also contends that the patent in suit is invalid for lack of invention. The feature of the patent on which plaintiff relies is the provision of an outer surface having "a multiplicity of exposed recesses into which the mortar of a seam may enter in substantial amount and harden to lock said structure in such seam." Plaintiff concedes that except for this feature this structure presents nothing new, and it is clear from a consideration of the prior art that this is so. The use of multi-ply structures for flashing had long been known, and particularly the use of such a structure made up of an inner ply of metal with outer plies of water-proofed fibrous material. The Siebel patent, No. 441,036, issued in 1890, was for a roofing or isolating material consisting of a metallic foil having united thereto on both sides a layer of fabric such as paper or felt impregnated with tar, asphalt, pitch or some like substance. The 1931 Shakespeare patent No. 1,813,089 was for a flashing material composed of a thin sheet of copper covered on both sides with felt which had been impregnated with asphalt.

The question then is whether the exposed recesses previously described as the distinctive feature of the patent in suit show such inventiveness as to make the structure described a patentable one. In this connection reference must be made to the Sandell patent No. 2,017,106, issued on October 15, 1935 on an application made on December 5, 1933. The patent in suit was issued on June 18, 1935 on an application dated January 27, 1935. It appears that the patent in suit was issued inadvertently without consideration of the co-pending Sandell application. This perhaps was due to the fact that the Sandell application was examined in Division 56 of the Patent Office while the Cohen-Wasserman patent, while originally assigned to Division 56, was transferred to Division 33 where it was actually examined.

The Sandell patent was for a waterproofing sheet material for building construction. It provided for a structure composed of several layers of material, the inner one being either a perforated sheet of metal or a woven wire fabric, and the outer layers being of woven fabric which had been impregnated with asphalt. Between the inner layer and the outer layers are intermediate layers of plastic asphalt. The outer layers of fabric are depressed from opposite sides of the material into the spaces between the strands of the inner wire fabric or into the perforations of the inner sheet of metal, thus forming a pattern of ridges and depressions on the outer surfaces of the completed material. The specification of the Sandell patent describes this as an improved material for use as flashing in masonry walls. In particular the specification points out that at certain locations in the building "the material 10 is embedded in mortar 16 which is utilized to bind the adjacent courses of masonry together and this binding material enters the depressions 15 provided in the upper and lower surfaces of the material 10 between the ridges 14 thereof and acts to bond the flashing material and masonry structure together and prevent a relative movement therebetween in a horizontal plane." (Numbers refer to the figures accompanying the patent application.) Clearly this is substantially what is claimed as the distinctive feature of plaintiff's patent, i.e., "exposed recesses into which the mortar of a seam may enter in substantial amount and harden to lock said structure in such seam." The essence of what is claimed to be the invention in plaintiff's patent was thus clearly anticipated by Sandell.

The only difference to be found is that in the patent in suit, the recesses for the reception of mortar are to be provided by leaving open the interstices of the fabric of the outer ply, while Sandell sought to attain the same effect by depressing this outer fabric into the openings or perforations of the inner ply. This in itself shows only a slight modification of the Sandell method, using materials already well known to the art, and one which has not been shown to give any practical advantage. One Cohen, a co-inventor of flashing cov-

ered by the patent in suit, testified that he had experimented for more than a year in an endeavor to discover a fabric which could be used to make a flashing that would correspond to that described in the patent. He said that after trying such materials as cheesecloth, coarsely woven and finely woven burlap, and heavy netting about one-quarter inch thick, he was unable to find any fabric which would furnish recesses of the kind described in the claims of his patent. Thus the patent in suit teaches at best only a theoretical variation on the Sandell invention, and one which has never proved of practical value.

The conclusion, therefore, is that the patent in suit was anticipated by Sandell, and hence is invalid for want of invention.

Complaint dismissed; judgment for defendant with costs.